IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

DANIEL A. DZINA,                    ]
                                    ]
            Plaintiff,              ]        Case No. 1:02CV2436
                                    ]
v.                                  ]        Judge Oliver
                                    ]        Magistrate Judge Vecchiarelli
UNITED STATES OF AMERICA,           ]
                                    ]
            Defendant.              ]


**UNITED STATES' MEMORANDUM IN OPPOSITION
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**


Respectfully Submitted,


GREGORY A. WHITE
United States Attorney


STEVE A. SHERMAN
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Stn.
Washington, D.C. 20044
(202) 307-6404
Stephen.A.Sherman@usdoj.gov

## UNITED STATES' MEMORANDUM IN OPPOSITION
## TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

The United States hereby submits its memorandum in opposition to plaintiff's motion for summary judgment. The Court should deny plaintiff's motion for summary judgment for a refund of federal excise tax on excess benefits from a charity under 26 U.S.C. § 4958 because there is sufficiently strong evidence to support a post-trial finding that, as a disqualified person and the organization manager with respect to the charity (which plaintiff has now admitted), he received excess benefits from the charity. In any event, there is sufficient evidence that creates factual issues that prevent the awarding of summary judgment. In addition, plaintiff's legal arguments that the excise statute was not in effect with respect to the excess benefits received by the plaintiff, and that the excise tax here is prohibited by an income tax provision of the Internal Revenue Code, are without any merit.

### Summary of Argument

The plaintiff, Daniel Dzina ("Dzina"), was assessed by the Internal Revenue Service for an excise tax under § 4958 of the Internal Revenue Code,[1] which imposes an excise tax on disqualified persons or "insiders" of exempt organizations who are the recipients of excess benefit transactions and organization managers who knowingly participate in such transactions. An "excess benefit transaction" is any transaction where the value received by the disqualified person exceeds the consideration received by the charity. A "disqualified person" means any individual who is in a position to exercise substantial influence over the affairs of the organization.

Dzina was an executive and trustee of Cleveland Golden Gloves Assn., Inc., ("Gloves" or the "Charity") and he ran and controlled the Charity for his own benefit as his privately owned business. Initially, Dzina sought to profit by selling real property, through his wholly owned corporation, to the Charity. Dzina set the price of the property at an unreasonably inflated amount

---

[1] All § references are to the Internal Revenue Code unless otherwise stated.

1

with the prospect of making a substantial profit on its sale to Gloves, if Gloves could pay, and with little risk in the event Gloves defaulted since it would be improving the property in the meantime. It soon became apparent that Dzina could profit more by letting the Charity improve the property and then take back the improved property and lease it out himself.  As a result, Dzina decided that he would exercise his control over the Charity to have it make the improvements, even while defaulting on payments for the property, and thereafter take the property back and either lease it or sell it.  So, Dzina continued to have Gloves make substantial improvements to his property with funds that should have been used for Gloves' charitable purposes or for payments on the Charity's contractual obligations to Dzina's wholly-owned company.  Dzina ~~deliberately~~ caused Gloves' default by seeing to it that Gloves made the improvements instead of its contractual payments and thereby ensuring the return of his property that was improved with the Charity's money.

The repossession of the property was made easier by having the purchase initially structured as an (unrecorded) installment land contract rather than a straight purchase, secured by a mortgage.  Under the installment contract, there was no transfer of property by deed as there would be under a loan and purchase agreement.  As a result, the property always remained titled in the name of Dzina's company.  When he declared a default, he simply said by the terms of the contract the property (albeit with substantial improvements) is mine again, without having to go through a foreclosure or formal forfeiture proceeding to regain title to the property.  At the end of the day and after the dust had settled, Gloves ended up with nothing despite having raised and spent substantial sums of money and Dzina ended up with his property improved with Gloves's money.

### STATEMENT OF FACTS

This case is about a charity and one of its executives, Dzina, who controlled and benefitted from his control of that charity.  Gloves is a tax-exempt non-profit amateur boxing association. The purpose of the Charity is to train young boxers, often disadvantaged kids from poor neighborhoods, and hold amateur boxing matches.  Hughes-Exh.10 at ¶3.

2

In the early 1990s, Dzina's long time friend and business associate Anthony Hughes had recently been elected President of Gloves.  Hughes had been a professional heavyweight boxer and for a long time had been involved with the amateur boxing Charity.  Hughes invited, and Dzina accepted, membership to Gloves' board of trustees.  In return, Gloves, which did not have any physical facilities, accepted Dzina's offer to have Gloves use his offices located at Cleveland Industrial Square, Inc., 4500 Lee Road, Cleveland, Ohio. Soon thereafter, Dzina became a Vice President and Executive Director of Gloves.[2]  Dzina-Exh 26 at p.138.

Dzina had been in the real estate business and was experienced in purchasing and thereafter renovating and leasing out realty.  In approximately December 1993, Dzina's new wholly owned company, Northpoint Athletic Club II, Inc. ("Northpoint"),[3] purchased property located at 18909 South Miles, Warrensville  Heights, Ohio (the "Miles Property") at the price of $435,000.  Exh. 2.

Dzina, through his corporation, Northpoint, offered to sell the Miles Property to Gloves and Dzina personally recommended it to Hughes. Hughes, who trusted Dzina at the time and relied upon his real estate experience, accepted the recommendation.  In January 1995, Hughes signed a land installment agreement under which Gloves agreed to purchase the Miles Property for approximately $2 million dollars. Ex.3.  For Dzina, the $2 million sale represented an approximate $1.5 million increase in market value from the original $435,000 purchase price of the Miles Property just 13 months earlier.  Hughes-Ex33 at ¶4,5,8.

There was no appraisal obtained at the time of the January 1995 contract.  It was not until a year later, that Dzina obtained an appraisal that showed the Miles Property was worth approximately $2 million (*i.e.,* as of January 1996).  However, during 1995, Gloves (and

---

[2] Dzina testified that he did not recall what his positions were with the Charity until he was shown documentation of his positions.  Dzina at p. 89.

[3] Northpoint is a "Subchapter S" corporation that files a Form 1120S income tax return on which all financial matters flow through the corporation to its shareholders, in this case Dzina.  In other words, for tax purposes, Dzina and Northpoint are effectively the same.

apparently to some extent Northpoint) made substantial improvements to the Miles Property and, therefore, the Miles Property was worth significantly less than $2 million in January 1995. Davis-Ex.31.¶4,5,6.

At the outset, Gloves lacked the funds to purchase the Miles Property for $2 million. To finance the purchase, Gloves discussed the possibility of holding bingo games and, after renovating the facilities using the bingo proceeds, renting out most of the approximate 127,000 square footage of the Miles Property to tenants. Gloves also discussed soliciting contributions. In April 1995, Dzina, on behalf of Gloves, obtained a bingo license (which his own company could not have obtained since it was available only to charities). Gloves began holding two bingo sessions per week and was receiving as much as between 10 and 12 thousand dollars per session after deductions for paid-out winnings. Crawford-Ex.30.¶8,9,10,11; Hughes-Ex.33.¶9.

At the time of the installment contract in January 1995, the Miles Property was in serious disrepair. After executing the installment contract, Gloves made substantial improvements to the Miles Property with the bingo proceeds during 1995, 1996 and 1997. Hughes-Ex.33; Meador-Ex.29, ¶ 6; Crawford-Ex.30, ¶ 7, 9; Dunn-Ex.27, ¶ 9. Dzina was responsible for making the improvements, controlled the check book, and wrote most of the checks for the payment of the improvements. Hughes-Ex.33, ¶ 18; Dzina at Ex.26, p.104, 114. Gloves' 1996 financial statements show that it spent approximately $291,000 on improvements for the Property. Ex.16.

However, during this same time period, Dzina did not cause Gloves to make any payments on the installment contract which provided for 120 monthly payments of approximately $25,000. As a result, in late 1995, after the new tenants occupied the Miles Property, Dzina declared the initial default and lucrative leases were assigned to and entered into with Northpoint, instead of Gloves. Hughes-Ex.33, ¶ 15; Dunn-Ex.17, ¶ 8. For example, in February 1995, Gloves and Northpoint, as co-lessors, entered into a lucrative lease, effective as of October 1995, with a soccer company to rent a portion of the building. The lease provided for the payment of approximately

$575,000 over a five year period. Meader-Ex.29; Lease-Ex.6..  However, as a result of the default, the lease was assigned from Gloves to Northpoint.  Crawford-Ex.30.¶15.  In fact, notwithstanding this an other 1995 leases, Gloves reported zero (0) rental income on its 1995 tax return and only $4,000 on its 1996 tax return, even though the soccer lease provided for monthly payments in the first year of the lease in the amount of approximately $9,000.[4]  Tax Returns - Exs.12&1 3.  In January 1996, immediately following the declaration of default, Dzina's Northpoint entered into a lease with a new tenant (Nail Salon) with the Miles Property.  Ex.8.

In June 1996, Dzina had Gloves enter into a new or second installment land contract that provided for the purchase of approximately 20% of the original 127,000 square footage of the Miles Property for $477,000. Ex.4.  Gloves never made any payments on the second contact either, but continued to make payments for the improvements of the Miles Property.  Soon afterwards, Dzina found a financially able buyer for the entire property.  So, in 1997, he declared another default, reclaimed the remaining portion of the Miles Property from Gloves, and in July 1997, he sold the property to Cleveland Sportsplex, Ltd. ("Sportsplex")  for approximately $2.9 million dollars.  Crawford-Ex.30, ¶ 16, 17; Sale Agreement-Ex.6.  The $2.9 million contract represented a very substantial increase from the original $435,000 price tag that Dzina, through Northpoint, paid in December 1993, and a substantial increase from the overpriced $2 million January 1995 contract with Gloves.

Meanwhile, during 1995 and 1996, some members of the Charity's board of trustees felt that Dizna was keeping them in the dark about the operations of Gloves.  Messrs. Dunn and

---

[4]  Gloves' own tax returns contradict Dzina's representation that Gloves received significant amounts of rental income.  In Dzina's brief, he claims that the Charity received rental income and attaches a number of supporting checks and invoices.  The exhibits should stricken and precluded, or at least treated as inadmissible evidence, because they are not accompanied by sufficient foundational evidence, and for failing to produce these documents that were requested during discovery.  The documents produced by Dzina in discovery were bate-stamped.  However, Dzina's exhibits are not bates-stamped.  Also, and perhaps more importantly, the documents do not evidence that the money was actually received by the Charity.

Stewart requested that Hughes call board meetings and obtain financial statements from Dzina in order to review them.  Dunn-Ex.27, ¶ 6, 7; Hughes-Ex.33, ¶ 13.  Gloves's business books and records, financial statements, and tax returns were kept personally by Dzina at his Cleveland Industrial Square offices and were prepared by Myron Hren.  Dzina hired Hren, who also prepared all of  Dzina's personal and other business tax returns and financial statements.  Dzina-Ex.26, p.105; Dunn-Ex.27, ¶ 27.

Despite the board's and Hughes' efforts, Dzina never provided any financial statements to the board for their review.  Dunn, who was a member of the board of trustees and a director of the police athletic league which leased from Gloves and Northpoint, resigned from the board as a result of his inability to carry out his responsibilities because of Dzina's conduct.  Dunn-Ex.27, ¶ 4, 5, 6, 7 ("Mr. Dzina told me basically that the financial statements of Gloves were none of my business").  After learning of the initial contractual default, Hughes and the other trustees were upset because they did not understand how there could be a default since everything was apparently going according to plan.  Gloves was raising substantial funds from the bingo games, substantial improvements had been made to the Miles Property, and Gloves had recently entered into a lucrative lease with a soccer company.[5]  Hughes- Ex.33.¶13,15; Dunn-Ex.27.

Hughes began raising questions regarding the legitimacy of the default, particularly given the large sums that were be raised from the bingo games.  Hughes wanted some accountability about the bingo funds and thought that Dzina had too much control over the bingo games.  Both Hughes and Dzina were precluded by state law from operating the bingo games because they both had criminal records.  Notwithstanding the state law prohibitions, Dzina was able to control the bingo games.  Dzina had his long time associates, Fred Kovacs and Mathew Ging, operate the

_____

[5] To the extent Dzina may argue that his concession that he is a disqualified person renders his control over the Charity irrelevant, that would be mistaken.  Dzina used his control to keep the other persons from effectively being able to interfere with his overall scheme to assure that he would benefit from the improvements that were being made with Charity's funds.

bingo games, count the money, and prepare and maintain the bingo records.  Dzina was also seen in the bingo offices while Hughes was kept out of the offices.  Hughes could not get any adequate answers about the foregoing issues or any adequate accounting of the proceeds of the bingo games, and, as a result, he regretfully resigned in protest despite his long term involvement with the amateur boxing organization.  Hughes-Ex.33, ¶ 10, 14, 15, 16; Crawford-Ex.30, ¶ 12, 13.

Originally, one of Dzina's principal defenses had been to deny that he is a "disqualified person."  Complaint-¶10.  Although he has recently conceded this issue, his conduct in previously seeking to bolster his contentions remains relevant both to his intent in the purpose for which he completely controlled the Charity, and to his credibility and even the authenticity of documents he offers.  Dzina contended that the governing body of Gloves was a board of directors that had voting power and that such board of directors determined policies, and that he just implemented their polices.  Therefore, he argued that he is not a disqualified person because his control over Gloves was limited by a purported board of directors.  Dzina has also disputed any contention that there was a board of trustees (as opposed to a board of directors) of Gloves with voting power.  Dzina contended that Gloves had individual trustees but that they were so-called honorary positions with no voting power.  Dzina-Ex.26, pp. 61-67, 136.  In reality, there was no actual board of directors, but instead, according to its organizational documents, Gloves is run by a board of trustees.   Hughes-Ex.33.¶7,16;  Dunn-Ex.27.¶2,6.; Corporate Charter- Ex.25.

To support Dzina's board of directors contention, he has created a number of purported minutes of purported board of directors' meetings where these directors purportedly discussed the operations of and set polices for Gloves.  The board of directors purportedly included his close associates Fred Kovacs, Matthew Ging, and Ron Stackhouse.   Dzina-Ex.26, pp. 67-68; Crawford-Ex.30, ¶ 12; Hughes-Ex.33, ¶ 10.

However, the foregoing minutes have been fabricated, the meetings never occurred, and there was never any board of directors.  Dzina, supported by phony documents, has been

attempting to create the illusion of a governing body consisting of his close associates in order to rebut the actual board of trustees' concerns about Dzina and his control over the charity, in a manner that caused the default on the installment contract. Goodman-Ex.32; Crawford-Ex.30, ¶ 18; Minutes-Exs.34-37 (a set of duplicate and conflicting minutes).

On or about December 13, 2001, the Internal Revenue Service ("IRS") issued its Notice of Deficiency and asserted the proposed assessment of the excise taxes against the plaintiff for the excess benefits he received as a result of his relationship and transactions with the Charity regarding the Miles Property. The IRS' proposed assessment was based upon certain improvements that Gloves made to the Miles Property. The notice asserted excess benefit transactions in the amount of $741 for 1995, $273,769 for 1996, and $29,835 for 1997. The foregoing amounts were taken from Gloves' own tax returns and financial schedules. For instance, the foregoing $273,769 amount included $93,755, $51,515, $19,814, and $34,005 that were taken from the depreciation schedules that were part of Gloves' Form 990 tax return for 1996. The depreciation schedules show that the foregoing amounts were being depreciated over a forty year period and therefore, are considered to be depreciable realty improvements to the Miles Property. Notice of Deficiency - Exhibit 1; 1995, 1996, 1997 Form 990s - Exs-18-20.

Based upon the amounts of the above improvements and pursuant to § 4958, the IRS assessed Dzina a set of first tier taxes of 25% under § 4958(a)(1) for being a disqualified person and a 10% tax under § 4958(a)(2) for being an organizational manager who knowingly participated in the excess benefit transaction, in the amounts of $259 for 1995, $95,819 for 1996 and for $10,442 for 1997, for a total amount of $106,521. The IRS also assessed Dzina a so-called second tier tax of 200% under § 4958(b) in the total amount of $608,689 for all three years. However, the second tier tax is not collectable until after the conclusion of this case, and only if Dzina does not correct the excess benefit transactions within the appropriate period of time (i.e., he must return the benefits to Gloves). See § 4961. Dzina paid the first taxes and later filed the present complaint

seeking a refund of the first tier taxes of $106,521 and an abatement of the second tier taxes.

## Summary Judgment Standards

Federal Rule of Civil Procedure 56(c) provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c)). At the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Gutierrez v. Lynch, 826 F. 2d 1534, 1536 (6th Cir. 1987). For purposes of summary judgment, a court is obligated to accept the evidence set forth by the nonmoving party as true and must draw all justifiable inferences in its favor. Lujan v. Defenders of Wildlife, __ U.S. __, 112 S.Ct. 2130, 2137 (1992). It is noted preliminarily that the plaintiff's motion for summary judgment is supported solely by plaintiff's own affidavit which contains self-serving and conclusory allegations that are replete with hearsay.

## ARGUMENTS

Dzina's summary judgment motion should be denied. As he has belatedly admitted, Dzina is a disqualified person (because of his near absolute control of Gloves) and an organization manager (because of personal involvement in all these transactions), and the only remaining issue is whether he was a recipient of significant excess benefits. Based upon summary judgment standards, the evidence is more than sufficient to create factual issues sufficient to deny plaintiff's motion. In addition, plaintiff's legal arguments are equally without any merit. Dzina's argument that he is not subject to the excise tax because the January 1995 contract pre-dates the effective date of the statute is without merit because the assessments are not based upon any amounts received by Dzina prior to the effective date of the statute. Dzina also argues § 109 prevents the government from assessing the improvements under § 4958, but § 109 deals only with income tax

9

effects of a reversion of leasehold interest to a landlord.

**Legal Background**

Section 4958 imposes an excise tax on excess benefit transactions between a tax exempt organization and a disqualified person. An excess benefit is the amount by which the value of the economic benefit provided by a tax exempt organization directly or indirectly to or for the use of any disqualified person exceeds the value of the consideration received for providing such benefit. § 4958(c)); Reg. (26 C.F.R.) § 53.4958-1(b). A disqualified person is any person who was is in a position to exercise substantial influence over the affairs of the organization.

A disqualified person who receives an excess benefit from a transaction is liable for the payment of a § 4958(a)(1) first tier excise tax in the amount of 25 percent of the excess benefit. In addition, an organization manager who participates in an excess benefit transaction, knowing that it was such a transaction, is liable for payment of a Section 4958(a)(2) tax equal to 10 percent of the excess benefit, unless the participation was not willful and was due to reasonable cause. If an organization manager also receives an excess benefit from the excess benefit transaction, the manager may be liable for both taxes imposed by Section 4958(a). Reg. § 53.4958-1(a).

If the transaction is not corrected within the period provided by the statute, then the disqualified person is liable for an additional tax under § 4958(b) in the amount of 200 percent of the excess benefit. Section 4958(b) is often referred to as a second tier tax and pursuant to § 4961©) is not collected until after the conclusion of this case and until other procedural matters are completed.

**I. Dzina is both a Disqualified Person and an Organization Manager**

Dzina, in his complaint (paragraph 10) and in his administrative claim (attached to his complaint), asserted that he is not a disqualified person and an organization manager. However, Dzina now concedes both in his motion for summary judgment. Dzina's degree of control over the Charity, and his effort to hide that fact (including by fabrication of documents) is nevertheless

10

relevant because it was part of an overall scheme to use his control for personal gain, and because it goes to the credibility of the only person whose affidavit has been submitted in support of summary judgment.

As noted above, to support Dzina's contention that there was an independent board of directors, he has fabricated a number of purported minutes of board meetings where these directors purportedly discussed the operations and authorized Dzina to undertake actions.[6]  The purported board of directors included his close associates Messrs. Kovacs, Ging and Stackhouse.  Dzina hired these persons, and Ging continues to be employed by Dzina in his current real estate business.   Dzina-Ex.26, pp.67-68; Gloves Tax Returns-Exs. 13, 14.

Dzina ran Gloves' business and financial operations as his own personal business.  He personally ran and was responsible for all business aspects.  The financial records of Gloves were kept by Dzina and were not kept in Gloves's offices but instead were kept in Dzina's personal offices at another corporation, Cleveland Industrial Square, Inc.  Dzina also signed the vast majority of Gloves' checks, was responsible for the renovations and for the leasing of the Miles Property.  In addition, the financial statements and tax returns of Gloves were prepared by Myren Hren, who had (and still has) been preparing Dzina's financial records and tax returns for all of his personal and business matters.  Finally, Dzina was a member of the board of trustees of Gloves, its executive director, its vice president and then later its president before resigning sometime in 1998.  Dzina-Ex.26, pp.105-06; Dunn-Ex.27, ¶ 7; Hughes-Ex.33, ¶ 8; Gloves's tax returns-Exs. 12-14.

In sum, Dzina certainly had the practical ability to use his influence to cause Gloves to agree first to pay above market value for the Miles Property, next to use its available funds to make

---

[6] For example, Ms. Goodman, a former secretary of Dzina, has stated that Dzina has forged minutes and that meetings referred to in those minutes never occurred.  Goodman-Ex.32.  Mesrrs. Dunn and Hughes have also stated that there was no such board of directors and that Dzina had to much control in running the charity.  Hughes-Ex.33, ¶ 18.  In addition, Mr. Crawford, a former business associate of Dzina has also stated that he saw Dzina argue with Ron Stackhouse, who prepared some of the purported minutes, over whether there were any such board minutes.  Crawford-Ex.30, ¶ 18.

11

improvements in preference to paying installments on the land contract, then to agree to revise the agreement to give back 80% of the property while continuing to default on payments, and finally to agree to give back the rest of the property, without demanding, in exchange, anything for the improvements.

## II.  Dzina Obtained Substantial Excess Benefits From The Charity

Dzina used his over control over Gloves to obtain numerous excess benefits from Gloves. Initially, Dzina attempted to sell the Miles Property to the Charity for an exorbitant profit.  In January 1995, Dzina, through his Northpoint company, sold the Miles Property to Gloves at an inflated price of approximately $2 million while only 13 months earlier, in December 1993, Northpoint purchased it for $435,000.  Dzina contends that it was sold at a fair market value.  In support, Dzina testified that he obtained a verbal estimate from an appraiser at the time of the January 1995 purchase that corroborated his $2 million sales price.  Dzina-Ex.26, p.79, 101. Contrary to Dzina's testimony, the appraiser denies that he never gave Dzina any such verbal estimate.  Davis-Ex.31, ¶ 2, 4, 5.  In fact, Davis valued the property at approximately $2 million as of January 1996, a year after the January 1995 installment contract date.  Davis also states that the Miles Property would have been worth substantially less than $2 million in January 1995, because his $2million appraisal reflected (1) significant improvements that were made to the property that had been just recently done on the property, and (2) the rental income from a recent lucrative lease that became effective in October 1995.  The lease was signed in February 1995, but that was still after the January 1995 appraisal, and substantial improvements had to be made for the lessee to take possession.  Crawford-Ex.30, ¶ 15; Meador-Ex.29.  Another lease also was entered between the time of the installment contract and the $2 million appraisal.  Dunn-Ex.27.

Dzina also attempts to justify the $2 million sales price by stating he made improvements to the property before he sold it to the Charity that caused it to significantly increase in value by approximately $1.5 million.  Dzina states that in 1994 that he obtained contractors to dump fill

material on the property that significantly expanded the parking lot.  Dzina states specifically that he hired Great Lakes Construction Co. to dump the fill in 1994.  Again, however, Dzina's statements are contradicted.  The President of Great Lakes states that it was not until 1995 (after the Charity had entered the contract for the Miles Property) that he dumped the fill, and as such, clearly contradicts Dzina's statements.  Strazzo-Ex.28, ¶ 4.  This was corroborated by two other witnesses.  Meador-Ex.29; Hughes-Ex.33.  In addition, Dzina admitted, in responses to written discovery, that he spent only approximately $65,000 on the Miles Property prior to selling it to the Charity.  Discovery Responses- Ex.24.  Dzina claims that the increase in value was partly attributable to dirt fill dumped on the property by persons who wanted to be rid of it and charged little.  It seems highly unlikely that the investment of $65,000 and the dumping of some nearly-free dirt would improve the value of the property by approximately $1.5 million in 13 months.

Finally, it is Dzina's own statements regarding the improvements he claims he put into the Miles Property that contradict his own claim that the Miles Property was worth $2 million in January 1995, before the improvements.  Dzina claims that he spent approximately $345,000 on the Miles Property from June to December 1995.  Dzina S.J. at p.24.  (He makes this claim as part of his argument that he should be given an offset or credit for the improvements to the properly that he paid for.).  Dzina claims that in January 1995, the Miles Property was fairly valued at $2 million dollars.  However, the January 1996 appraisal by the same appraiser (obtained by Dzina) values the property at $2 million – after the $345,000 Dzina claims he spent to improve the property.  Therefore, there can be little question that the Miles Property was worth substantially less than $2 million in January 1995, before the improvements.

However, it was after the sale to the Charity that Dzina began to actually profit or receive excess benefits from the significant improvements that were made to the Miles Property by Gloves.  After acquiring the Miles Property, the Charity, under the direction and control of  Dzina, began making substantial improvements to the property with its existing funds, as well as with funds

thereafter generated from bingo operations.  Gloves' own financial statements, (Statement of Financial Position-Property and Equipment) reports that hundreds of thousands of dollars that were invested in the Miles Property.  Exhs. 15, 16, 17.  Furthermore, a number of persons who had first-hand knowledge of the improvements being made to the property observed the poor condition of the Miles Property soon after it was acquired by the Charity, and thereafter observed the substantial improvements that the Charity made to the property.

In addition to profiting from the improvements made by the Charity,  Dzina also profited when he reclaimed the renovated property under the guise of contractual defaults and sold it for a substantial profit.  In July 1997,  Dzina's Northpoint sold the Miles Property for approximately $2.9 million, notwithstanding the fact that, as shown below, he has repeatedly misrepresented that the sales price was approximately $2.1 million.

In any event, a portion of the profits that were realized from the sale are clearly attributable to the investments that Gloves made to the property.  Gloves had been an owner of the Miles Property while it appreciated, and had invested substantial sums in renovating the property, but defaulted on payments for the property because Dzina chose not to have Gloves make payments on the installment land contract.  Therefore, Gloves was entitled to a portion of the profits from the sale of the Miles Property to Sportsplex.  However, Gloves never received any money from the sale of the Miles Property.  But for Dzina's having caused Gloves to forfeit the property back to him, Gloves could have sold the property and received the profits and repaid its "debts" to Dzina.  Therefore, Dzina effectively took the profits from the Charity when he recovered the property and resold it himself and obtained those profits.

Dzina has represented to the Court and to the government repeatedly that the sales price of Miles Property to Sportsplex was approximately $2.1 million.  This is stated in his Summary Judg-ment Motion (at p. 11), is reflected in the IRS exam report attached to the notice of deficiency (Ex. 1), and was also stated in his responses to the government's first interrogatories (at p.16).  (We

assume Dzina will not deny this.  The interrogatory answers can be produced to the Court on request.)  Dzina has used this $2.1 million sales figure to support his argument  that the improvements made to the property by Gloves were not that beneficial to Dzina because it only represented an approximate $100,000 increase from the original $2 million sales value ($2.1 million less $2 million).  However, the actual sales price of $2.9 million clearly shows at least some of the profits realized from the sale were partially attributable to the improvements made to the property by the Charity.[7]

The IRS did not make its assessment based upon any excess benefit Dzina obtained from the final sale of the Miles Property.  However, now that the government has learned that the actual sales price of the Miles Property was approximately $2.9 million and not $2.1 million as represented by Dzina, the government may defend the assessment by, if necessary, including a portion of the profits from the sale of the Miles Property as part of the excess benefits received by Dzina.  The IRS is legally entitled to defend a suit for refund on any ground available and is not limited to the IRS's determinations.  See Lewis v. Reynolds, 284 U.S. 281 (1932).

### III.  Dzina's Arguments Against the Excess Benefits are Without Any Merit

Dzina's arguments to rebut the excess benefits lack any merit.  Dzina's argues (1) that he is entitled to an offset for the Charity's free use of the Miles Property, (2) that he is entitled to offset the improvements Northpoint paid for, and (3) that some of the improvements made by the Charity did not contribute to an increase in the market value of the property.

### 1.  Free Use of the Miles Property.

Dzina argues that Gloves had free use of the Miles Property (because it failed to make any

---

[7] On page 16 of his interrogatory answers, Dzina argues that "the limited change in sales price" from January 1995 to July of 1997 is evidence that the expenditures by Gloves had no impact on the value of the Miles Property.  Since this argument is based on a $2.1 million price in 1997, it follows that, once the price is corrected to $2.9 million, then, by Dzina's *own logic*, the value went up by at least $800,000.  In fact, as noted above, the increase was far greater since the original $2 million sale price was well above market.

of the installment contract or lease payments) and that such free use should be a credit or an offset against any amount of any excess benefit charged against Dzina.  For that argument to have any merit, Northpoint, Dzina's company, should have recognized for tax purposes, some rental income or gain on the installment contract or on the rental income from the lease with Gloves in the year in which the property was forfeited back to Northpoint (rather than waiting to report all the gain at the time of the sale to Sportsplex in 1997.)   However,  Northpoint did not recognize any such installment gain or rental income, and therefore Dzina is not entitled any credit for such "free use." Dzina cannot have it both ways, he did not recognize any profit or income in 1996, and therefore should not be given credit for any purported free use of the Miles Property.

Perhaps more fundamentally, if one is now to permit offsets for unpaid purchase contract installment payments, to be consistent, it would be necessary to credit or allocate all appreciation of value to the Charity.  As noted, the combined increase from value appreciation and improvements was at least $800,000 (and more since the original $2 million contract price was above market).  Thus, any offsets for unpaid installment payments should be charged not against the value of the improvements alone (which are all that the IRS assessed) but against the total increase in value over the period that could have been assessed, and on the basis of which the United States is now entitled to uphold the assessment.  See Lewis v. Reynolds.  Even if one credits all $578,732 in offsets claimed on page 12 of Dzina's summary judgment brief, there would still be an excess benefit of $232,000 (800,000 - 578,000).  Moreover, some of the offsets are clearly untenable.  For example, the unpaid rent after the complete cancellation of both purchase contracts cannot be claimed as setoff to benefits Dzina already had received.[8]

_____

[8] In addition, the value of any offset should be reduced by the rental income that Northpoint received from the Miles Property.  Tax Returns-Exs. 18, 19, 20.  Gloves had entered into a number of leases in the fall of 1995 including a lucrative lease with a soccer company that involved initial payments of approximately $9,000 per month, and other leases, with a total monthly value of approximately $12,000 as determined by Dzina himself.  Gloves' own tax returns and financial statements (prepared and signed by Dzina and his personal accountant) do not report any rental income for 1995 and only $4,000 rental income in 1996.  In contrast, Northpoint reports rental income during the foregoing periods.  Therefore,

Moreover, and contrary to Dzina's contention, Gloves never had any significant beneficial use of the Miles Property. The Charity "owned" the property for the period of time necessary for Dzina to take advantage of the Charity's use of bingo proceeds to make improvements to the property, then recover the property, lease out a major portion of the property to a third party, and then later recover the remaining portion and sell the entire property for a substantial profit. Dzina's scheme to profit from his control over the Charity has been made clear by the sequence of events that have been described here.  The Charity's activities such as providing boxing facilities, boxing matches, and the youth center, were a necessary part and cost that Dzina had to accept in order to effectuate this profit scheme, as demonstrated under subpoint 3 below.

### 2.   Dzina is Not Entitled to any Credit for His Improvements

Dzina contends that he should be given credit or offset for the improvements he paid for. However, as explained above, Dzina made these improvements not for the Charity's benefit but for his own benefit.  As soon as the improvements were made and tenants had settled in, Dzina declared defaults, and the lucrative leases were assigned to Dzina's Northpoint company.  Dzina's improvements are also inconsistent with the terms of the first land contract, which provided that the Charity was responsible for making all improvements in exchange for not having to make the first five months' payments.

In addition, Dzina cannot be given credit for any improvements he made because he already recovered them when he reclaimed the Miles Property and resold it for a substantial profit. When Dzina sold the Miles Property to Sportsplex, he recovered the money he invested for any additional improvements because he received a huge profit on the sale.  Therefore, after already recovering the money he invested, he is not now entitled to any additional "credit" for it against the improvements made with Gloves's money.

---

any possible offset for the free use of the Miles Property should be reduced by the rental income received by Northpoint from the Miles Property leases, that should have gone to the Charity as the equitable owner of the property during that time period.

Moreover, the amounts of Dzina's improvements are not supportable or reliable.  North-point's financial statements do not specify the amounts that were spent or invested specifically on the Miles Property.  Northpoint's 1995 financial statement reports only the total amount for improvements and expenditures for two properties owned by the company.  It does not break down the numbers between the two properties that Northpoint bought at the same time, even though it was spending substantial sums on both properties during that time period.  Crawford-Ex.30, ¶ 7.

Also, Dzina's alleged amounts of expenditures are highly suspect given his lack of credibil-ity.  There are no loan agreements to substantiate the loans.  Dzina and Northpoint's financial and tax returns are inherently unreliable and unreasonable.  These documents are no more reliable than the corporate documents such as minutes of board meetings that were fabricated by Dzina.  Dzina has a history of preparing documents long after the events purportedly occurred in an effort to provide evidentiary support to a legal contention.  Goodman-Ex.32; Crawford-Ex.30, ¶ 21.

### 3.  The Charity's Expenditures Either Improved the Property or Benefitted Dzina

The improvements the Charity made to the Miles Property benefitted Dzina, directly or indirectly.  Dzina argues that a significant amount of the improvements made by the Charity only benefitted the Charity and not him.  In support, Dzina alleges that some of the improvements were torn down by the subsequent purchaser, Sportsplex.  These improvements include the painting, construction of the bingo and boxing interior facilities.

However, the foregoing expenditures were necessary in order to enable the Charity to raise funds in order to pay for the capital improvements made to the Miles Property.  For instance, the construction of the bingo facilities enabled the Charity to raise money to finance the actual structural improvements.  Similarly, the construction of the boxing facilities was necessary in order to permit Gloves to operate as an exempt organization so that it could legally obtain the bingo licence.  In other words, without the bingo and boxing facilities, Gloves could not have raised the money to make the improvements.  Dzina did not pay for the boxing and bingo facililties, but

18

benefitted by them because they enabled him to carry out his scheme.  Northpoint itself could not have obtained a bingo license to generate the funds used to pay for the improvements which were made ultimate for its benefit.  Crawford-Ex.30, ¶ 10.

In addition, what a subsequent purchaser does to the property after it purchases it is not necessarily relevant.  A subsequent purchaser may have different plans for the property, but that does not mean that the improvements made to the property by the seller did not improve the value of the property.[9]  In any event, the Miles Property increased in value from the less than $2 million value in January 1995 (actually much less) or the $2 million value in January 1996 to $2.9 million in July 1997.  Clearly, the Charity's improvements contributed to the increase in value of the Miles Property or otherwise enabled Dzina to benefit.[10]

### IV.  Dzina's Other Legal Arguments Lack Merit.

Dzina argues that the § 4958 assessments are improper (1) because the land installment contract was entered into before the effective date of the statute, and (2) because the assessment is prohibited by § 109 regarding income taxes.  Both arguments are without merit.

The assessments here are not precluded by the effective date of the statute because assessments are not based upon the payments that were due under the land contract that was entered into prior to the statute effective date.  The IRS made its assessments based upon improvements made by the Charity on the Miles Property after the September 14, 1995 effective date of the statute.[11]

-----

[9] For instance, a seller could have installed a swimming pool that increased the value of a residence. The fact that a subsequent purchaser fills in the pool, does not mean that the pool did not increase the value of the residence.

[10] The purpose of § 4958 should be borne in mind here.  Charities may earn income free of income tax because they are tax exempt.  If that income is used to benefit persons who control the charity for their personal gain, the purpose of the tax exemption is subverted.  Here tax-exempt bingo income was used to make improvements to real estate nominally transferred to the charity temporarily and then returned to Dzina's other company.  Taxing the improvements is thus consistent with the policy behind the statute.

[11] If the contract had been entered into after September 14, 1995, then any payments made under the contract by the Charity would have been considered excess benefits because the contract for sale of the Miles Property to the Charity reflected an inflated price due to Dzina's control over the Charity.

19

In 1995, the IRS assessed Dzina on only $741 in excess benefits (out of the total excess benefits of approximately $306,000 for the first tier taxes) precisely because the September 1995 effective date prevented any assessment for the improvements that were made before that date.

Section 109 does not preclude an assessment under § 4958.  Section 109 precludes treatment as income, for income tax purposes, the improvements to property that reverts to a landlord after reversion of a lease.  It does not preclude an assessment of an excise tax on a person who takes advantage of his control of a charity to cause the charity to benefit himself.  In addition, there was no lease reversion in this case.  There was a contract to *purchase* the Miles property, followed by a default that Dzina engineered, while causing the Charity to make improvements financed by bingo operations that Dzina's own companies could not engage in.  Dzina received excess benefits as defined under § 4958, and therefore he is subject to the excise tax imposed by that provision.

### V.  Conclusion.

A reasonable analysis of the facts here can lead to only one conclusion: Dzina took advantage of his control over the Charity to personally profit.  Certainly he has not established that there is no genuine issue of fact for trial, upon the basis of which the government could prevail.  Accordingly, Dzina's summary judgment motion should be denied.

GREGORY A. WHITE
United States Attorney

/s/ Steve Sherman
STEVE A. SHERMAN
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Stn.
Washington, D.C. 20044
(202) 307-6404
Stephen.A.Sherman@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March _2_, 2004, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.

/s/Steve Sherman_____
STEPHEN A. SHERMAN
Senior Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C.  20044
Telephone:  (202) 307-6404
Stephen.A.Sherman@USDoj.gov

**APPENDIX**
**UNITED STATES' EXHIBIT LIST**

1.  INTERNAL REVENUE SERVICE'S NOTICE OF DEFICIENCY (Attached to plaintiff's complaint.

2.  1993 (DECEMBER) NORTHPOINT'S PURCHASE OF MILES PROPERTY

3.  1995 (JANUARY) LAND INSTALLMENT CONTRACT

4.  1996 (JUNE) LAND INSTALLMENT CONTRACT

5.  1997 (JULY) NORTHPOINT SALE AGREEMENT WITH SPORTSPLEX

6.  FEBRUARY/ OCTOBER 1995 GLOVES LEASE WITH FUTURE GENERATIONS CO.(SOCCER)

7.  SEPTEMBER 1995 GLOVES/NORTHPOINT'S  LEASE WITH POLICE ATHLETIC LEAGUE

8.  JANUARY 1996 NORTHPOINT'S LEASE WITH NAIL SALON

9.  1996 (JANUARY) APPRAISAL

10.  NO EXHIBIT

11.  1994 GLOVES' TAX RETURN

12.  1995  GLOVES' TAX RETURN

13.  1996  GLOVES' TAX RETURN

14.  1997  GLOVES' TAX RETURN

15.  1995 GLOVES' FINANCIAL STATEMENTS

16.  1996 GLOVES' FINANCIAL STATEMENTS

17.  1997 GLOVES' FINANCIAL STATEMENTS

18.  1995  NORTHPOINT'S TAX RETURN

19.  1996  NORTH POINT'S TAX RETURN

20.  1997 NORTHPOINT'S TAX RETURN

21.  1995 NORTHPOINT'S FINANCIAL STATEMENTS

22.  1996 NORTHPOINT'S FINANCIAL STATEMENTS

23.  1997 NORTHPOINT'S FINANCIAL STATEMENTS.

24.    DZINA'S DISCOVERY RESPONSES TO SECOND U.S. DISCOVERY
       REQUESTS

25.    GLOVES' CORPORATE CHARTER DOCUMENTS

26.    DEPOSITION OF DANIEL DZINA

27.    DECLARATION OF CLYTEE DUNN

28.    DECLARATION OF VINCENT STRAZZO (GREAT LAKES CONSTRUCTION)

29.    DECLARATION OF GARNETT R. MEADOR (FUTURE GENERATIONS -SOCCER)

30.    DECLARATION OF WILLIAM "RUSS" CRAWFORD

31.    DECLARATION OF JOHN DAVIS (APPRAISER)

32.    DECLARATION OF CAROL GOODMAN

33.    DECLARATION OF TONY HUGHES

34.    MINUTES OF THE BOARD OF "DIRECTORS" - DECEMBER 12, 1994

35.    MINUTES OF THE BOARD OF "DIRECTORS" - DECEMBER 30, 1994

36.    MINUTES OF THE BOARD OF TRUSTEES - DECEMBER 12, 1994

37.    MINUTES OF THE BOARD OF TRUSTEES - DECEMBER 30, 1994

38.    DECLARATION OF STEPHEN A. SHERMAN